[Crim. No. 344. Third Appellate District.—June 5, 1916.]

## THE PEOPLE, Respondent, v. HENRY NAN COLLIS, Appellant.

CRIMINAL LAW—MURDER—INTOXICATED CONDITION OF DEFENDANT—IN-STRUCTION.—An instruction in a prosecution for the crime of murder that "no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in that condition, but, whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that *the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act,*" is not erroneous, upon the theory that the plea of "not guilty" interposed by the defendant to the information limited the defense to the sole question as to the commission of the crime by the defendant, and that to have warranted proof of the intoxicated condition of the defendant, it was necessary to set up that fact by way of a special plea.

ID.—PLEA OF NOT GUILTY—DEFENSES PERMISSIBLE UNDER.—The plea of "not guilty" to a criminal charge admits of any defense which the facts justify, except those of once in jeopardy and former acquittal or conviction.

ID.—APPLICABILITY OF INSTRUCTIONS UPON INTOXICATION—EVIDENCE OF DEFENDANT.—The defendant in such a prosecution cannot contend that instructions upon the subject of intoxication are inapplicable where he himself brings out the fact of his intoxicated condition at the time of the homicide.

ID.—CONSIDERATION OF EVIDENCE OF INTOXICATION—INSTRUCTION—IN-FERENCE OF COMMISSION OF CRIME BY DEFENDANT UNWARRANTED. An instruction that "it is a well-settled rule that drunkenness is no excuse for crime. Insanity produced by intoxication does not de-

stroy responsibility when the party, when sane and responsible, made himself voluntarily intoxicated; and drunkenness forms no defense whatever to the fact of guilt, *for when a crime is committed by a party while in a fit of intoxication,* the law will not allow him to avail himself of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. Such evidence can only be considered by the jury for the purpose of determining the degree of crime, and for that purpose it must be received with great caution," is not erroneous upon the theory that the italicized portion trespassed upon the domain of fact by declaring that the defendant did the killing.

APPEAL from a judgment of the Superior Court of Mariposa County, and from an order denying a new trial. **J. J. Trabucco,** Judge.

The facts are stated in the opinion of the court.

John A. Wall, L. J. Schino, and B. S. Wilson, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was convicted of the crime of manslaughter under an information charging him with the crime of murder, and appeals to this court from the judgment of conviction and the order denying him a new trial.

The homicide occurred at a mining camp in Hunter's Valley, Mariposa County, on the fifth day of November, 1915.

The victim of the tragedy, Thomas B. Lynn, and one William Thornton, a resident of Chowchilla, Madera County, were the joint owners of certain mines located in Hunter's Valley. The defendant was employed by them at said mines and worked for them on a percentage basis.

Thornton had not been at the mining camp for some five weeks prior to the date of the homicide, he having been ill during that period at his home in Chowchilla. On the fourth day of November, however, he put in an appearance at the camp. He, the defendant and the deceased were the only persons present at the time of the shooting. Thornton claimed to have seen the defendant shoot Lynn, and from his testimony, as given at the trial on behalf of the people, the following facts relative to the homicide are gleaned:

Upon arriving at the camp on the morning of the 4th of November, Thornton observed that Lynn and the defendant had been drinking heavily. He further discovered that there were not sufficient provisions in the house for their then present purposes, and thereupon proposed to the defendant that they (defendant and himself) go to Pleasant Valley and Jasper Point, in said county, and at those places purchase groceries and such other articles as were then needed at the camp. The defendant agreed to this, and the two accordingly left the camp together for the places above named, one carrying a rifle and the other a shotgun, with which they might kill any game which they might run across. On the way to those points the defendant told the witness of trouble he had had with the deceased. He said to Thornton that the deceased had annoyed him greatly in his (deceased's) talk on Socialism, with which subject the latter appears to have been obsessed, and that he (defendant) "thought two or three times that he would have to kill him." The two finally arrived at Pleasant Valley, and Thornton, having purchased some supplies, which included four quart bottles of whisky, started on his return to the camp, accompanied by the defendant. Upon their arrival at the camp they and the deceased and one James Young, who had called at the camp, proceeded to drink the liquor, with the result that all of them became more or less intoxicated, the defendant getting so drunk that by 12 or 1 o'clock he was required to take to his bed. Thornton, however, had previously gone to bed, and testified that, while in bed, and before the defendant had retired, he heard a heated argument going on between the latter and the deceased.

On the fifth day of November the deceased arose quite early and went to Jasper Point, a distance of three miles from the camp, for the purpose of getting mail. He returned at about 8 o'clock in the morning, but later in the day again went to Jasper. In the meantime, the defendant remained at the camp and in his bed, being greatly under the influence of liquor.

The deceased returned to the camp from his second trip to Jasper at between the hours of 5 and 6 P. M. At this time, Thornton was sitting on a chair on the outside of the house and about fifteen feet to the left of the front door of the house. The defendant, with no other clothing on but his

shirt, suddenly appeared at the door and inquired: "Where is Lynn?" to which Thornton replied: "There he comes from Jasper," whereupon the defendant exclaimed, "I am going to shoot him." Immediately following the threat the defendant raised and aimed a gun at Lynn and fired. Lynn made a loud exclamation and said to the defendant: "Happy, Happy" (the defendant was familiarly known as and called "Happy"), "don't shoot no more—you have hit me." Thornton sprang from his chair and said, addressing the defendant, "What do you mean, Happy?" to which the latter rejoined, addressing Thornton, "You s—n of a b—h, I will shoot you." The defendant, who was still at the door and a little inside the house, then brought his weapon around as if to fire another shot. Thornton started to get out of range and had taken only a few steps when the gun was again discharged. "I would like to say that before that," testified Thornton, "I heard the shell hit the floor inside the house, so I knew the gun was loaded, so I beat it. I do not suppose I got over sixty yards until the gun went off the third time. I did not stop any more. I did not see any more than the first shot. The second and third shots I did not see. . . . I fell just as it went off the third time. I kept on. I thought I would go and have him arrested. I heard a voice singing over on the road. I went across the mountain and kept hollering for him and he did not answer me." Upon reaching the road, Thornton met a gentleman named Williams, to whom he imparted information of the shooting and requested him to go to a store near by and telephone for the sheriff or constable. The constable at Hornitos, in said county, was finally reached and apprised of the shooting, and, accompanied by two or three other persons, immediately started for the scene of the shooting, arriving there late at night. They found the dead body of the deceased lying on the ground a short distance from the point where he stood when shot, there being physical evidence that the body had been dragged from the one point to the other.

After their arrival at the camp, and before the defendant was aware of their presence there, the constable and his party saw the defendant leave the house and go to the spot where lay the body of Lynn and, by the aid of a lighted match or a light otherwise produced, apparently view or look at the body. He was heard at this time to say, speaking to a dog

which was with him and barking, "Show me, show me Thornton—I am going to kill the s—n of a b—h."

The defendant was later arrested and positively denied, as he did at the trial, shooting Lynn or knowing by whom he was shot.

An inquest held by the coroner of the county into the cause of the death of Lynn developed that death had been produced by gunshot wounds. One of the bullets "entered the right chest six and one-half inches from the shoulder, two and one-half inches from the center of the chest, and came out ten inches from the top of the left shoulder, and five inches to the left of the spinal column, the center of the back." Another bullet entered the left thigh ten inches from the center of the knee-cap and came out two inches below where it entered.

There is, as will later be perceived, no just ground for a serious claim that the verdict is devoid of sufficient support. Indeed, since the evidence upon its face is by no means improbable, there exists no ground for the support of such a claim.

The theory of the defense at the trial was that Thornton and not the defendant committed the crime. There was an attempt at sustaining that theory, and (it may be added) a few circumstances presented which might well be regarded as tending to support it. But the jury did not accept that theory, evidently being convinced that Thornton's version of the homicide was true. The verdict, upon the record as presented before us, is final and conclusive upon this court.

It is claimed, however, that the court committed prejudicial error by the giving of the following instructions:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in that condition, but, whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that *the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.*

"It is a well-settled rule that drunkenness is no excuse for crime. Insanity produced by intoxication does not destroy responsibility when the party, when sane and responsible, made himself voluntarily intoxicated; and drunkenness forms

no defense whatever to the fact of guilt, *for when a crime is committed by a party while in a fit of intoxication,* the law will not allow him to avail himself of his own gross vice and misconduct to shelter himself from the legal consequences of such crime. Such evidence can only be considered by the jury for the purpose of determining the degree of crime, and for that purpose it must be received with great caution.''

The above instructions were based upon and the first substantially in the language of section 22 of the Penal Code.

It is contended: 1. That instructions upon intoxication are wholly inapplicable to this case, since (so it is claimed) the defendant's condition for sobriety or inebriety on the occasion and at the time of the shooting was only incidentally brought into the case and not for the purpose of mitigating the offense or reducing the crime to the lesser degree or grade thereof or of acquitting the accused; 2. That the instructions trespassed upon the domain of fact in that they in effect declared that the defendant committed the act of killing the deceased.

The objections thus urged against the instructions are untenable.

The argument in support of the first of the propositions above stated appears to be based upon the theory that the plea of ''not guilty'' interposed by the defendant to the information limited the defense to the sole question whether the defendant actually committed the act of destroying the life of Lynn, and that, to have warranted proof of the intoxicated condition of the defendant, at the time of the homicide, it was necessary to set that fact up by way of a special plea. This, we say, seems to be the theory of the argument, or, at any rate, is the necessary effect thereof. Of course, there is absolutely no basis in law for any such notion.

The plea of ''not guilty'' to a criminal charge admits of any defense which the facts justify, except those of once in jeopardy and former acquittal or conviction. Self-defense, the plea of insanity, or the plea that the accused was not guilty of any connection whatever with the commission of the crime may be introduced under the general plea of ''not guilty.''

That the instructions were applicable to the case at bar, we think the record clearly and unquestionably shows. Counsel for the defendant themselves brought out the fact

of the defendant's intoxicated condition on the occasion and at the time of the homicide. They brought out the fact not only by and through the defendant himself, by questions directly propounded to him and addressed to that subject, but also by and through the witness Young, who testified on behalf of the defendant. What their special motive or purpose was in proving the fact, it is not material to inquire or necessary to ascertain. The fact remains that they did introduce proof that the defendant was greatly under the influence of intoxicating liquor at the time of the homicide, and, therefore, the instructions complained of and the principle therein announced were peculiarly applicable to the case and most properly given to the jury.

The second ground of objection to the instructions arises from the language thereof which we have put in italics. By that language, it is claimed, as above stated, that the court invaded the function committed by the constitution exclusively to the jury in that it involved an instruction upon a question of fact and virtually said to the jury that the defendant committed the crime charged in the information. But the instructions are not reasonably susceptible of the construction so given them, and are, therefore, not obnoxious to the objection to which they would be amenable were that construction maintainable.

The instructions, as only a cursory examination of them will readily attest, merely involve a statement in abstract form or in a general way of the rule as to the drunkenness of one charged with the commission of a crime at the time of the commission thereof as it is laid down by section 22 of the Penal Code, *supra*. They, in other words, only abstractly declare what the rule of law is upon the satisfactory proof of facts of on indicated nature. Nowhere therein is it declared that the facts to which the instructions would be pertinent were proved, nor do they directly refer to the accused or intimate that he committed the crime charged.

Instructions based upon said section of the Penal Code have often been given in language substantially, if not precisely, the same as that in which the challenged instructions are framed and have been uniformly approved by the higher courts. Indeed, we are not able to perceive how the rule could be stated intelligently in materially different language. Nor can we understand how the jury, in view of the other

instructions read to them, could have obtained such a conception of the meaning of the instructions as counsel's construction of them would give to them. The jury must be assumed to have been composed of men of good common sense, and that they must have fully and clearly understood the duty resting upon them from the instructions which, in plain and unmistakable language, told them that they were the sole and exclusive judges of the credibility of the witnesses and the effect and probative value of the testimony; that a defendant was at all times and until a verdict was reached to be presumed to be guiltless of the crime charged or of any crime or degree of crime therein involved, and that a verdict of conviction would be justified only after they were convinced from the evidence to a moral certainty and beyond all reasonable doubt of the defendant's guilt. Surely, with the law as thus stated before them, the jury could not have understood the instructions on intoxication as involving a statement by the court that the defendant had committed the crime charged or the act of slaying the deceased.

Counsel say that the verdict demonstrates that Thornton's testimony was discredited and, indeed, wholly disregarded by the jury, and that, therefore, the defendant probably would not have been convicted but for the instructions given. The argument is that Thornton's was the only testimony presented in the case tending in the slightest measure to connect the defendant with the commission of the crime; that it showed the killing to have been deliberate, wanton, and without cause or provocation; that, if true and believed, the testimony warranted no other verdict than that of murder of the first degree. The argument, in its application to the instant case, is wholly destitute of force or merit. As shown, there was evidence of the intoxicated condition of the accused at the time the homicide was committed. The jury could, therefore, have consistently believed the story of Thornton in its entirety and at the same time, under the instructions complained of here and the evidence addressed to the intoxicated condition of the defendant, have justly concluded that the verdict reached and returned by them was the proper one. Indeed, inasmuch as there was no other evidence than Thornton's testimony tending in any degreee whatever to establish the defendant's guilt, we may properly assume that the jury believed Thornton, and would have found the ac-

cused guilty of one of the degrees of the higher offense but for the instructions here challenged.

There are no other points presented in the case.

The judgment and the order are affirmed.

Chipman, P. J., and Ellison, J., *pro tem.*, concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 3, 1916.